UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMAL VAUGHN | CIVIL ACTION |
| VERSUS | NO: 18-07735 |
| AMERICAN COMMERCIAL BARGE LINE, LLC | SECTION: "J" (2) |
| | JUDGE: CARL J. BARBIER |
| | MAGISTRATE: JOSEPH C. WILKINSON, JR. |

### AMERICAN COMMERCIAL BARGE LINE, LLC'S
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**NOW INTO COURT**, through undersigned counsel, comes Defendant, American Commercial Barge Line, LLC ("ACBL"), who in accordance with this Court's Scheduling Order [R. Doc. 26], Pre-Trial Notice [R. Doc. 26-1], and Minute Entry [R. Doc. 56] submit the following Proposed Findings of Fact and Conclusions of Law:

### PROPOSED FINDINGS OF FACT

**I.    Introduction**

1.    Plaintiff, Jamal Vaughn is a person of the full age of majority residing in Louisiana.

2.    American Commercial Barge Line, LLC ("ACBL") is a foreign limited liability company that does business in the State of Louisiana and within this Honorable Court's jurisdiction.

8.    This case involves a Jones Act seaman injury claim by Jamal Vaughn ("Vaughn").

9.    At all material times, ACBL employed Vaughn as a deckhand aboard the M/V SAFETY EXPLORER.

10.    The M/V SAFETY EXPLORER is owned by J. Russell Flowers, Inc. On January 19, 2018, the M/V SAFETY EXPLORER was under bareboat charter to ACBL. As such, at the time of the incident, ACBL was the owner *pro hac vice* and/or operator of the M/V SAFETY EXPLORER.

11.    At the time of his alleged accident, ACBL had employed Vaughn since February 2016.

12. Considering the evidence and testimony presented at trial, the Court issues the following findings of fact and conclusions of law.

## II.   The Alleged Incident – January 19, 2018

13. On January 19, 2018, the M/V SAFETY EXPLORER departed ACBL's Tiger Fleet near Baton Rouge, Louisiana with a two-man crew onboard: Captain Ian Beckman ("Beckman") and Vaughn, a deckhand.

14. At this time, Capt. Beckman had been a U.S. Coast Guard licensed captain since September of 2008 and had worked in the inland river towing industry since 2005.

15. The vessel was traveling "light boat" (i.e., without barges) and was headed to ACBL's Harahan Fleet for scheduled and ordinary repairs.

16. As the vessel approached Mile Marker 125, the vessel struck the bow of a second vessel, the M/T R.S. TARA that was moored to the Valero Dock. The incident occurred at approximately 4:30 a.m. and the M/V SAFETY EXPLORER was making about 10.1 miles per hour at the time of impact.

17. At the time of the allision, Vaughn was located in the galley. According to Vaughn, while in the galley, he felt the vessel hit something and the next thing he recalled was picking up a freezer door after it fell onto his leg and ankle. Post-incident, as evidenced by photographs, various items and equipment were askew in the engine room, wheelhouse, and in the galley.

18. Vaughn testified that the refrigerator fell over and that it struck his leg and he injured his head, neck, shoulder and back.

19. The parties have stipulated that the allision of January 19, 2018 was caused by the negligence of Capt. Ian Beckman.

## III.   Plaintiff's Post-Accident Medical Treatment and Current Status

18. Immediately after the accident, Vaughn was taken to Pelican State Outpatient with complaints of right shoulder and neck pain, as well as headaches. Medical personnel diagnosed him with an unspecified head injury and a muscle strain in his neck. A physical examination revealed normal range of motion in Vaughn's neck.

19. Medical personnel ordered further diagnostic imaging. X-Rays of the head, neck, and right shoulder were normal.

20. Vaughn then presented to to Baton Rouge General Emergency Room for radiographic studies of the brain and neck. A CT scan of Vaughn's head returned normal with no acute intracranial hemorrhage. Medical personnel did note a bruise on Vaughn's right scalp. A CT scan of Vaughn's neck also noted no abnormal findings and specifically noted that "disc spaces are maintained."

21. Vaughn was discharged and sent home with pain medication.

22. On January 20, 2018, Vaughn returned to Pelican State Outpatient complaining of neck stiffness and soreness and pain in his right shoulder. Vaughn denied any loss of consciousness, confusion or dizziness.

23. Dr. James Patterson of Pelican State Outpatient diagnosed Vaughn as suffering from an unspecified head injury, a muscle strain in his neck, and an unspecified sprain of his right shoulder. He recommended an MRI of the right shoulder and prescribed Vaughn pain medication for his neck and shoulder pain.

24. Dr. Patterson instructed Vaughn to follow-up but noted he could return to work with restrictions/modifications. Specifically, medical records note he would be limited to no lifting greater than 10 pounds and to sedentary onshore work.

25. An MRI of Vaughn's right shoulder on January 23, 2018 revealed a partial tear/tendinosis in the anterior fibers of the supraspinatus tendon.

26. On January 26, 2018, Vaughn returned to Pelican State Outpatient. Vaughn reported pain and stiffness in his neck and pain in his right shoulder. Vaughn also reported his headaches had resolved. Dr. Patterson discharged Vaughn from the clinic and instructed him to follow-up with an orthopedist for further evaluation and treatment of his right shoulder and neck.

27. Dr. Patterson again noted Vaughn could return to work with the same restrictions – no lifting greater than 10 pounds and limited to sedentary onshore work.

28. On January 31, 2018, Vaughn presented to Dr. Gregor Hoffman with Southern Orthopaedic Specialists. Vaughn complained of right shoulder pain and stiffness in his neck. Dr. Hoffman evaluated Vaughn, reviewed the diagnostic imaging, and diagnosed him with a right shoulder partial rotator cuff tear along with a neck strain. Dr. Hoffman ordered physical therapy and instructed Vaugh return in a one month, unless he experiences any problems.

29. Vaughn returned to Dr. Hoffman on February 28, 2018 and reported no improvement from physical therapy. In addition, Vaughn complained of increased neck pain. Dr. Hoffman ordered an MRI of Vaughn's cervical spine.

30. On March 16, 2018, Vaughn presented to Dr. Hoffman again complaining of pain in his right shoulder and neck region. Dr. Hoffman reviewed the cervical MRI and noted that it showed minor degenerative changes at C5-C6-C6-7 mainly to the left side. Dr. Hoffman recommended Vaughn continue with physical therapy. In addition, Dr. Hoffman kept Vaughn from working due to the demands of his deckhand job. Dr. Hoffman gave Vaughn an injection in his shoulder and instructed Vaughn to follow-up in 3-4 weeks.

31. Vaughn returned to Dr. Hoffman on April 20, 2018. He complained again of pain in his neck and right shoulder. Dr. Hoffman gave Vaughn another injection (1 cc of Depo-Medrol and 1 cc of lidocaine). Dr. Hoffman instructed Vaughn to suspend physical therapy for one week then to resume and follow-up again in 3-4 weeks.

32. On May 9, 2018, Vaughn again returned to Dr. Hoffman with pain in his right shoulder and neck and reported no improvement. Dr. Hoffman recommended Vaughn undergo a right shoulder arthroscopy repair of his torn tendon. Surgery was scheduled for May 23, 2018.

33. Vaughn underwent his right shoulder arthroscopy rotator cuff repair surgery on May 25, 2018. The surgery was successful and Vaughn started his recovery post-surgery.

34. Vaughn underwent physical therapy for a few months, which seemed to help, though his neck pain was becoming more significant.

35. On July 23, 2018, Vaughn returned to Dr. Hoffman complaining of neck pain and low back pain. This was the first time Vaughn reported any low back pain to a provider.

36. On October 10, 2018, Vaughn began treating with Dr. Andrew Todd at the behest of his attorney. Vaughn reported pain in his neck and lesser pain in his low back. Vaughn rated his neck pain as 5-6/10 in intensity and his low back pain as 4/10 in intensity. Based on Vaughn reports to Dr. Todd, Dr. Todd related Vaughn's neck and back pain to the January 19, 2018 incident. In reviewing the diagnostic imaging, Dr. Todd opined that Vaughn sustained a soft tissue sprain and strain of his lumbar spine, as well as an exacerbation of his preexistent cervical degenerative condition.

37. Dr. Todd recommended that Vaughn undergo a cervical epidural injection, which Vaughn received on November 26, 2018. Dr. Todd did not consider Vaughn a surgical candidate at this point.

38. In December 2018, Vaughn returned to Dr. Todd with continued complaints of neck pain, radiating into his left arm, and low back pain, but without any radicular symptoms and no significant objective findings on evaluation. Dr. Todd recommended additional physical

therapy for Vaughn's lumbar spine and medial branch blocks for his neck pain. Vaughn's treatment quieted down for a while, consisting mainly of physical therapy.

39.     The Court heard testimony from Dr. Everett G. Robert, a medical expert retained by ACBL.

40.     Dr. Robert was qualified as an expert in neurosurgery and the Court accepts Dr. Robert's testimony as credible.

41.     Dr. Robert testified that he performed an independent medical examination of Vaughn on March 4, 2019. After reviewing Vaughn's prior diagnostic imaging and performing an interview and physical examination of Vaughn, Dr. Robert testified that he did not see any clinically significant pathology to explain Vaughn's right upper extremity pain or his bilateral upper extremity pain or his neck pain. At most, Dr. Robert opined that Vaughn suffered from a cervical spinal and lumbar spinal sprain/strain, as a result of the accident.

42.     On June 14, 2019, Vaughn underwent another arthroscopic surgery on his shoulder for an AC Joint Resection with Dr. Hoffman.

43.     On November 14, 2019, Vaughn underwent a rhizotomy though the report does not indicate whether there was any relief from pain.   As of December 2019, when ACBL deposed Dr. Todd for the first time, he did not consider Vaughn to be a surgical candidate because "he is a young guy," and Dr. Todd expressed some optimism that Vaughn's neck and low back issues would settle down.  Dr. Todd also wanted to treat the neck issues prior to treating the back issues.

44.     On December 2, 2019, Vaughn returned to Dr. Hoffman and Dr. Hoffman found that Vaughn had reached maximum medical improvement with respect to his right shoulder. Dr. Hoffman ordered a Functional Capacity Evaluation ("FCE"). Dr. Hoffman testified at trial that he believed Vaughn reached maximum medical improvement for his right shoulder as of December 2, 2019.

45.     On December 3, 2019, Vaughn underwent a FCE at ISR Physical Therapy. The FCE was performed by Marc D. Cavallino, PT, OCS, Certified Functional Capacity Evaluator. There was no finding of significant symptoms and/or disability magnification.  Vaughn told the examiner he thought he could return to his previous job, but was concerned about overhead lifting.  Vaughn's pain complaints at the time of testing were limited to his shoulder.  Notably, he reported that he had no current neck or low back pain.  Based upon his evaluation and expertise, Cavallino felt that Vaughn was capable of performing "medium duty" work and could even perform his previous job with restrictions:



Patient: **Jamal Vaughn**
Date of Evaluation: 1/6/20
Employer: ACBL
Occupation: Deckhand
Age: 24
Height: 70 inches    Weight: 220 lbs
Date of Injury: 1/18/18
Diagnosis: right shoulder pain (M25.511)
Medications Taken Prior To This FCE: reports none
Functional Capacity Evaluator: Marc D. Cavallino PT, OCS



| Validity of Effort Analyzed |
| --- |

☒ **Good Validity of Disability Determination**- Client performed all tests safely and demonstrated consistent efforts which were determined to reasonably estimate true residual functional capacities.

☐ **Questionable Validity of Disability Determination:** Questionable results determined from this evaluation threatened the validity of accurately estimating true residual functional capacities.

☐ **Poor Validity of Disability**- Testing revealed inappropriate responses to valid tests and failed to find objective signs which validate the subjective presentation of the symptoms or impairment(s) of the client. This behavior threatens the validity of this report.

☐ **Submaximal Efforts Noted** - Certain effort(s) during this FCE were determined to be submaximal and threaten the validity of this report.

| Current Estimated Physical Demand Level (PDL) Capacity:<br>**Medium** |
| --- |

| Estimated Physical Ability To Return To Previous Employment:<br>**Able with restrictions** |
| --- |

46.    Although this FCE demonstrated that Vaughn could return to work in at least some capacity, Vaughn did not return to any work.

47.    Despite the foregoing FCE, Vaughn continued to treat with Dr. Todd throughout early 2020.

48.    In May 2020, Dr. Todd felt that conservative treatment had failed, but because Vaughn was so young, he did not want to proceed with surgery. He recommended that Vaughn modify his activities and follow-up as needed. Vaughn then returned a few weeks later with further complaints of neck and back pain which, according to Vaughn, were no longer tolerable. Believing Vaughn's complaints as legitimate, Dr. Todd ordered cervical and lumbar spine MRIs to see if anything could be done surgically to alleviate Vaughn of his pain. The MRIs were done in July 2020, and Vaughn returned to see Dr. Todd on August 5, 2020.

49. Dr. Todd's review of the cervical spine MRI indicated an apparent disc desiccation and posterior protrusion of disc material noted at C4-5 and C5-6, and less so at C6-7. Herniations were noted by the radiologist at C4-5 and C5-6 though Dr. Todd thought that perhaps there was an annular tear at C5-C6 not a herniation. For the lumbar spine MRI, Dr. Todd did not agree with the radiologist's opinion that there was distal desiccation and broad-based bulging of disc material at both L4-5 and L5-S1, though he did believe there was an annular tear at L4-5 that was degenerative in nature.

50. During his deposition, Dr. Todd testified that Vaughn was suffering from degenerative disc disease in the cervical spine. Because there was no history of cervical pain prior to Vaughn's accident, and because Vaughn had consistent complaints of pain since his accident, Dr. Todd believed Vaughn had an asymptomatic degenerative disc condition that was made symptomatic by the accident. A discogram was carried out on September 21, 2020 and found a positive pain response at C4-5. The radiologist's impression was that Grade 4 posterior annular tears were present at C4-5 and C5-6 with central disc herniation. There was also a finding of an abnormal reversal of cervical lordosis which the radiologist felt may be secondary to muscle spasm and a clinical history of trauma. Dr. Todd agreed with these findings.

51. Vaughn next returned to Dr. Todd on September 30, 2020, at which time Dr. Todd discussed the potential for a cervical disc replacement at C4-5 and C5-6. Vaughn initially scheduled the surgery, but then cancelled it. He eventually decided to proceed with the cervical surgery in March 2021, and Dr. Todd performed the total disc arthroplasty at C4-5 and C5-6 on March 25, 2021.

52. Dr. Todd saw Vaughn in June 2021 and noted in his records that Vaughn appeared to be healing as expected. Having addressed the cervical issue, Dr. Todd then turned his attention to the unspecified complaints of low back pain.

53. On August 11, 2021, Vaughn underwent a second FCE performed by Marc Cavallino PT, OCS. Vaughn reported complaints of neck, right shoulder and low back pain prior to the FCE. However, Mr. Cavallino found that Vaughn could return to medium duty work:

## Estimated Residual Functional Capacity

Functional capacity tests addressing static/dynamic postural tolerances and material handling capacities were completed. The results of this FCE <u>estimate</u> that the patient should be able to safely perform work consisting of job tasks classified in the physical demand level (PDL) of **medium** as defined in the Dictionary of Occupational Titles, 4th Edition (U.S. Dept. Of Labor) with the following restrictions:

1.) Occasional lifting of up to 50 lbs
2.) Frequent lifting of up to 25 lbs
3.) Occasional carrying of up to 40 lbs
4.) Please see page # 5 for all estimated residual abilities.

**Based on these findings it is determined that the client was unable to demonstrate sufficient residual functional capacities to safely return to his prior job as a deckhand without the restrictions described above. Comparison of his demonstrated residual capacities to the demands of his current job should be used for return to work consideration at this time.**

54. Again, Vaughn did not return to work in any capacity following this second FCE.

55. On October 4, 2021, Vaughn received an epidural steroid injection at L5 performed by Dr. Vanderbrook. In October 2021, Vaughn reported "excellent relief" from the injection, however he returned to Dr. Todd in March 2022 and reported that the back pain had returned, requesting another injection that was done in April 2022.

56. Regardless, on December 8, 2021, Vaughn underwent a third FCE with Joseph Shine, PT DTP COMT. On December 8, 2021, Mr. Shine found that Vaughn performed with consistent efforts and found that he could return to work at jobs that have lifting up to 30 pounds on an occasional basis, and that he is limited to occasional reaching with the right side. His walking, squatting, and climbing are limited to frequently (2.5-5.5 hours in an 8 hour workday) when lifting is involved. Vaughn can sit/stand constantly throughout a workday and can also perform walking up to six hours a day without repetitive lifting. Mr. Shine did not believe Vaughn could return to his old job as a deckhand, but he did release him to return to at least modified light to light-medium duty work:

***ESTIMATED RESIDUAL FUNCTIONAL CAPACITY :*** Functional capacity tests addressing static/dynamic postural tolerances and material handling capacities were completed. The results of this FCE <u>estimate</u> that the client should be able to safely perform work based on an eight (8) hour work day consisting of job tasks classified in the physical demand level (PDL) of **Light** as defined in the Dictionary of Occupational Titles, 4th Edition (U.S. Dept. Of Labor). The following ***limitations*** are suggested:

1.) Limit repetitive lifting from the ground to occasionally 30 lbs, and avoiding constant floor lifts
2.) Due to limited ability in right shoulder he is limited to occasional reaching and lifting on right
3.) Limit prolonged repetitive cervical and trunk motion without significant breaks
4.) Limit squatting, walking and climbing to frequent basis when lifting activity is involved

57.     Again, despite this third FCE, Vaughn still did not return to work in any capacity.

58.     Vaughn returned to Dr. Todd in the summer of 2022. Following this visit, Dr. Todd testified that he believed Vaughn had reached maximum medical improvement for his cervical spine as of June 22, 2022.

59.     As for Vaughn lumbar spine, Dr. Todd testified that Vaughn's treatment for his lumbar spine has plateaued and he can only offer him interventional pain procedures moving forward, such as epidural steroid injections.

60.     Dr. Todd testified that Vaughn followed up with him on June 22, 2022, September 16, 2022, November 28, 2022 and February 13, 2023. Vaughn complained of neck and low back pain at each visit, however Dr. Todd testified he did not recommend any lumbar surgery for Vaughn. In addition, Dr. Todd did not alter his determination that Vaughn reached maximum medical improvement for his cervical spine as of June 22, 2022.

61.     On November 14, 2022, Vaughn underwent a repeat epidural steroid injection at L5 and he reported improvement in his pain.

62.     On May 4, 2023, Vaughn underwent a repeat epidural steroid injection at L5 and he again reported improvement in his pain.

63.     Vaughn is not scheduled for any future surgeries and none of his treating physicians have recommended any future surgeries to him.

64.     Based on the documentary evidence and the testimony presented at trial, the Court finds that the January 19, 2018 incident caused Plaintiff's right shoulder injury. The Court further finds that the January 19, 2018 incident aggravated pre-existing degenerative conditions in Plaintiff's cervical and lumbar spine.

65. Based on the documentary evidence and the testimony presented at trial, the Court finds that Vaughn reached maximum medical improvement for his right shoulder injury on December 2, 2019.

66. Based on the documentary evidence and the testimony presented at trial, the Court finds that Vaughn reached maximum medical improvement for his cervical spine injury on June 22, 2022.

67. Considering the testimony of Dr. Todd and the medical records to date, the Court also finds that Vaughn also reached maximum medical improvement for his lumbar spine injury on June 22, 2022.

## IV.   Maintenance and Cure

68. ACBL has consistently paid Vaughn $30.00 per day in maintenance since the time of the accident. ACBL has also consistently paid all medical bills submitted to it by Vaughn or medical providers seeking payment for curative medical treatment rendered on Vaughn's behalf for injuries allegedly caused by the January 19, 2018 incident.

69. ACBL paid $149,813.56 in medical expenses on behalf of Vaughn.

70. Before trial, Vaughn claimed that there remained $44,239.19 in unpaid cure expenses. The parties stipulated that ACBL attempted to pay these outstanding amounts directly through the provider, however they could not, because Vaughn's attorney either paid these expenses or a third-party provider paid them. The parties stipulated at trial that these amounts have been paid and/or will be resolved.

71. Accordingly, the Court finds that ACBL satisfied its obligations to pay maintenance and cure. In addition, the Court finds that ACBL dutifully fulfilled its maintenance and cure obligations and did not act in an arbitrary and capricious manner in delaying the payment of these cure expenses paid for by Vaughn's counsel.

72. Further, in light of the Court's finding that Vaughn reached maximum medical improvement as of June 22, 2022, ACBL is entitled to a credit and offset for all maintenance and cure payments made after that date.

## X.   Vocational Rehabilitation and Economic Losses

73. The Court considered deposition testimony from Nancy Favaloro ("Favaloro"), an expert of vocational rehabilitation counseling, in lieu of live testimony. The Court accepts Favaloro's testimony as credible.

74.   Favaloro testified that, in her opinion and based upon her review of the FCE completed on December 8, 2021, Vaughn is be able to return to work in several jobs. In her opinion, Favaloro testified that Vaughn was qualified, based on his educational level, skills, abilities, worker traits and experience, to pursue jobs consistent with his physical restrictions, including but not limited to the following jobs: a service greeter, service advisor, courier, sales consultant, cashier, or central station operator. Median hourly wages for this type of work ranged from $10.54 per hour to $26.05 per hour:

| COMPATIBLE JOB TITLE | ACTUAL LABOR MARKET ENTRY LEVEL EARNINGS | MEDIAN HOURLY WAGE* |
|---|---|---|
| Service Greeter | 13.00-$15.00 per hour | $16.76 |
| Service Advisor | $45,000-$65,000 per year | $26.05 |
| Courier | $16.00 per hour | $14.03 |
| Sales Consultant | $40,000 per year | $25.52 |
| Cashier | $15.00 per hour | $10.54 |
| Central Station Operator | 14.00-$17.00 per hour | $18.35 |

*US Department of Labor, Bureau of Labor Statistics May 2022

75.   Favaloro testified that Vaughn can return to those jobs identified by her earning anywhere between $28,733.12 to $48,086.72 per year.

76.   The Court finds that Vaughn could return to work at a light to light-medium physical demand level.

77.   Moreover, the Court rejects any suggestion that Vaughn cannot return to work in some capacity. The Court notes that Vaughn has failed to carry his burden in establishing that he cannot return to work in some capacity.

78.   The Court further considered the expert reports submitted by both parties pertaining to Vaughn's alleged economic losses. Vaughn submitted a report from Mr. Shael Wolfson and ACBL submitted a report from Dr. Kenneth Boudreaux. Both Mr. Shael Wolfson and Dr. Kenneth Boudreaux were qualified as experts in economics and wage loss.

79.   Dr. Kenneth Boudreaux, ACBL's economist, gave an opinion as to Vaughn's past and future economic loss based upon an analysis he performed. He testified that he first calculated his average worklife expectancy by examining the most recent figure released by the United States Department of Labor's Bureau of Labor Statistics and ascertaining from that examination what the average number of years an individual of Vaughn's age, race, gender, and education level would be expected to be in the labor force. His average worklife expectancy from the date of the accident was 31.48 years. His average worklife expectancy from the June 12, 2023 trial commencement date was 26.08 years.

80.   Next, Boudreaux testified that he examined Vaughn's average annual income during the year 2017 to find a base salary with which to perform his analysis. He found that, based on a review of tax records and earnings statements, Vaughn earned $56,328.85 per annum.

81.   In his report, Boudreaux noted that employees usually receive from their employers certain fringe benefits not normally considered part of one's salary. That said, he noted that when an employee returns to any full-time employment, the most economically important fringe benefits are unlikely to be lost.

82.   Boudreaux then discounted the future economic loss to present day value. Present value of future loss is the amount of money that a recipient of an award can now invest such that the future proceeds of an investment (interest and principal) will reproduce the amounts lost, at the times they are expected to be lost. Boudreaux explained that the range of inflation adjusted discount rates was from 0.00% to 2.00%, before any adjustment for taxes. Boudreaux derived these rates from the returns currently available in risk free investments (U.S. Treasury "Inflation Indexed Bonds") that can readily duplicate the lost amounts across time.

83.   In arriving at his final calculations, Boudreaux adjusted the pretax discount rate downward each year to reflect the taxability of income from the investment represented by that pretax discount rate.

84.   As for past loss, Boudreaux calculated that Vaughn sustained past losses of $242,224.65, assuming that Vaughn has not worked since the accident.

85.   Based upon the evidence in the record and the testimony presented at trial, the Court finds that Plaintiff could have offset his wage loss by returning to work on December 8, 2021, the date of Plaintiff's last FCE. The Court finds that Plaintiff failed to mitigate his damages.

86.   As such, with this return-to-work date, Dr. Boudreaux calculated that Plaintiff could have earned $_____ from December 9, 2021 until the date of trial.[1]

---

[1] At the Pretrial Conference, it was decided that the economists would not testify at trial, but rather their testimony would be submitted though their expert reports. Dr. Boudreaux's trial testimony would have addressed the issue of past lost wages in light of the FCE's and the expert reports of the vocational rehabilitation counselors. However, because Dr. Boudreaux will be testifying through his expert report, the expert report will be supplemented to include his updated opinion with respect to past lost wages. Counsel for Vaughn has agreed to Dr. Boudreaux's supplemental expert report.

87. Accordingly, accounting for Plaintiff's pre-injury earning capacity of $56,328.85 and subtracting the amount that Plaintiff could have earned had he returned to work on December 9, 2021, at a rate of $38,409.92 (a median of Favaloro's findings), Plaintiff's past wage loss totals $_____.

88. In total, the Court finds Vaughn's past and future wage loss totals $_____.

## XI. Future Medical Care

89. At the trial of this matter, the Court heard testimony from Aaron Wolfson regarding a purported life care plan detailing allegedly necessary and reasonable future medical expenses. According to Aaron Wolfson, relying upon the opinions of Dr. Finney and Dr. Todd, Aaron Wolfson opines that Vaughn will incur future care ranging from $181,795.90 to $319,507.52. These amounts were then discounted to future value by Shael Wolfson to $175,093 to $297,937. The lifecare plan assumes that Plaintiff will require physical therapy, routine care by an orthopedic surgeon, routine diagnostics, medication, and epidural steroid injections.

90. As part of the life care plan, Aaron Wolfson relied on the opinion of Dr. Todd that Vaughn would need three epidural steroid injections per year over the course of five years. These injections would cost anywhere between $102,592 - $147,000, essentially 50% of Vaughn's life care plan.

91. The Court also heard testimony from Dr. Richard Vanderbrook. Dr. Richard Vanderbrook is a board-certified radiologist who also performs a vast array of minimally invasive spinal procedures for chronic neck and back pain. Dr. Vanderbrook was qualified as an expert.

92. At trial, Dr. Vanderbrook testified that performing three epidural steroid injections per year for five years was not the appropriate standard of care, not medically necessary and would actually pose a danger to Vaughn. Having considered the evidence and testimony, the Court finds Dr. Vanderbrook's testimony to be credible. The Court additionally finds that Plaintiff is not entitled to these costs.

93. In addition, the lifecare plan assumes Vaughn will need to attend four more years of physical therapy at a cost between $4,800 to $8,160. The projection that Plaintiff will attend physical therapy in the future is inconsistent with the record. At trial, Plaintiff testified that none of his treating physicians have recommended that he continue with physical therapy.

94. For all of these reasons, the Court finds that Plaintiff is not entitled to any damages for speculative future medical expenses.

<u>**PROPOSED CONCLUSIONS OF LAW**</u>

**I.**     <u>**Jurisdiction and Venue**</u>

1.     This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1333 and the Jones Act, 46 U.S.C. § 30104.

2.     Jurisdiction and venue are not contested by the parties.

**II.**     <u>**Liability - Jones Act Negligence**</u>

3.     The Jones Act creates a statutory cause of action for negligence. *Patterson v. Omega Protein, Inc.*, 26 F. Supp. 3d 544, 548 (E.D. La. 2014) (citing *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 415 (2009)).

4.     Under the Jones Act, employers have a duty to provide a reasonably safe place to work. *Daigle v. L&L Marine Trans. Co.*, 322 F. Supp. 2d 717, 725 (E.D. La. 2004). An employer breaches that duty if it fails to exercise ordinary prudence and is thereby negligent. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997) (*en banc*). An employer breaches its duty if it disregards a danger that it "knew or should have known." *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989). Although this duty is "broad," it is not tantamount to strict liability. *Colburn*, 883 F.2d at 374. Rather, the employer "must have notice and the opportunity to correct an unsafe condition before liability attaches."

5.     "The standard of care is not 'what the employer subjectively knew, but rather what it objectively knew or should have known.'" *Id.* (quoting *Turner v. Inland Tugs Co*., 689 F. Supp. 612, 619 (E.D. La.1988)). *See also Pechawer v. Art Catering, Inc*., C.A. No. 05-6870, 2007 U.S. Dist. LEXIS 53899, *3 (E.D. La. July 24, 2007).

6.     A Jones Act employer is liable if the seaman establishes by a preponderance of the evidence that the negligence of the employer or one for whom the employer is responsible played a part in actually bringing about or causing the injury that he sustained. *Litherland v. Petrolane Offshore Constr. Services, Inc.*, 546 F.2d 129, 132 (5th Cir. 1977).

7.     The parties have stipulated that the negligent actions of Capt. Ian Beckman proximately caused the allision on January 19, 2018. Accordingly, this Court pretermits any discussion of liability and focuses solely on recoverable damages.

**III.**     <u>**Recoverable Damages**</u>

8.     Under the Jones Act, a plaintiff may recover all of his pecuniary losses. *Cruz v. Hendy's Int'l Co.*, 638 F.2d 719, 723 (5th Cir. 1981). Pecuniary loss may include loss of earning

capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence. *Daigle v. L&L Marine Transp. Co.*, 322 F. Supp. 2d 717, 730 (E.D. La. 2004).

9.     Based upon the evidence and testimony presented at trial, the Court makes the following findings as to Vaughn's damages.

### A.     Past Wage Loss

10.    Vaughn is entitled to any wages that he would have earned had he continued to work as a deckhand through the date of trial, less (1) any wages that ACBL paid him; and (2) any wages that he could have earned despite his physical condition. *See Crum v. United States*, No. 99-2178, 2000 U.S. Dist. LEXIS 9598, at *3 (E.D. La. July 6, 2000).

11.    In the maritime context, an award for lost wages must be based on after-tax earnings. *See Myers v. Griffin -Alexander Drilling Co.*, 910 F.2d 1252, 1256 (5th Cir. 1990).

12.    Both Shael Wolfson and Dr. Boudreaux submitted calculations of Plaintiff's past wage losses. Wolfson does not state any assumption regarding Plaintiff's ability to return to work, *i.e.*, the wages that he could have earned despite his injuries. For this reason, the Court finds that Wolfson's brief analysis and calculation are not persuasive.

13.    In addition, the Court finds that Wolfson has improperly calculated and improperly inflated Plaintiff's past wage loss. In calculating Plaintiff's past wage loss, Wolfson grew Plaintiff's base wage rate from 2018 through 2022 at a rate of 3.7% annually based only upon the Employment Cost index, which is a measure of inflation in the labor market. *See also* Anirvan Banerji, *The Relationship Between Labor Costs and Inflation: A Cyclical Viewpoint*, U.S. Bureau of Labor Statistics, Economic Cycle Research Institute, May 24, 2005, https://www.bls.gov/opub/mlr/cwc/the-relationship-between-labor-costs-and-inflation-a-cyclical-viewpoint.pdf (last visited January 6, 2020) ("This article examines three popular measures of labor cost inflation to see how well they predict peaks and troughs in consumer price inflation. Specifically, it compares the *growth rates* of the Employment Cost Index . . . .") (emphasis in original); *Moore v. Univ. of Memphis*, C.A. No. , 2014 U.S. Dist. LEXIS 192229, at *10 (W.D. Tenn. Sep. 2, 2014) (noting that the Employment Cost Index was utilized to inflate comparable salaries for a professor).

14.    The calculation of a seaman's lost wages begins with the gross earnings of the seaman at the time of the injury. *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942, 950 (5th Cir. 2012).

15.    The calculation of lost earnings cannot be based upon generalized and speculative statistical data found in textbooks or published online. Rather, the calculation must be based upon a sufficient factual predicate — a factual predicate that is entirely lacking in

this case. Because there exists no sufficient factual predicate, Wolfson's calculations increasing Plaintiff's annual wages by 3.7 % from 2018 to 2022 amount to pure speculation and conjecture. Such speculation is inappropriate and unreliable. *See Martinez*, 481 F. App'x at 949 ("[A]n award for damages cannot stand when the evidence to support it is speculative or purely conjectural."); *Lawrence v. Great Lakes Dredge & Dock Co., LLC*, No. 17-9775, 2018 U.S. Dist. LEXIS 90722 (E.D. La. May 31, 2018) (excluding Wolfson's opinions that utilized an improper base wage rate). Accordingly, this Court affords no weight to Wolfson's calculations for past wage loss.

16.    Instead, the Court finds Dr. Boudreaux's calculations more reliable. As set forth above, based upon the evidence and testimony presented at trial, the Court finds that Vaughn could have returned to work as of December 9, 2021 and finds that Plaintiff is entitled to $_____ in past wage loss.

### B.    Future Wage Loss

17.    The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983) ("*Culver II*"). In that case, the court set forth a four-step process for determining lost wages as follows: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value. *Id.* at 117. Any award for future lost wages in the maritime context also must be based on after-tax earnings. *Id.*

18.    Indeed, an expert's ultimate opinion on future lost earnings must be grounded in sufficient factual support, not "unsupported conjectures;" otherwise, it is unreliable and inadmissible under Rule 702. *See Hathaway v. Bazany*, 507 F.3d 312, 318-319 (5th Cir. 2007) (finding that trial court properly excluded proffered expert testimony because it relied on insufficient factual support); *see also Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) ("A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*. [T]o be admissible, . . . [an] expert's ultimate opinion must be grounded in the scientific process and may not be merely . . . unsupported conjecture."); *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988) (excluding expert testimony that was based on assumption that part-time longshoreman would achieve full-time status) *cert. denied*, 488 U.S. 981, 109 S. Ct. 530, 102 L. Ed. 2d 562 (1988); *In re Air Crash Disaster at New Orleans, Louisiana*, 795 F.2d 1230, 1234 (5th Cir. 1986) (excluding expert testimony based on unsupported assumption that decedent's wage would have grown 8% annually).

19.    In calculating Plaintiff's future wage loss, Wolfson increased Plaintiff's yearly earnings by .8% between 2022 and 2056 (the end of his work-life), based upon "extended base line

projections from the Congressional Budget Office" that project the "growth of real earnings per worker broken down into periods of time into the future."

20. Wolfson's report and calculations run afoul of *Culver II*. The calculation of lost earnings cannot be based upon generalized and speculative statistical data found in a textbook or published online. Again, the calculation must be based upon a sufficient factual predicate — i.e., actual real evidence of increases in Plaintiff's earnings over time. Wolfson's reliance upon "textbook" theoretical wage rate increases that consider the average American are improper.

21. In *Culver II*, the Fifth Circuit recognized that evidence concerning the likelihood that the earnings of an injured worker would increase due to personal merit, increased experience and other individual and societal factors could be admissible, but only if appropriate under the circumstances. *Culver II*, 722 F.2d at 122. *Culver II* does not stand for the proposition that future earning capacity should be incrementally increased year-over-year simply as a matter of course.

22. Plaintiff presented no evidence or testimony at trial that he would receive incremental annual increases in his earnings. Wolfson's generalized annual increases based on the average American amount to speculation. *See Sheffield v. Int'l Paper Co.*, No. 2018-2701, 2020 U.S. Dist. LEXIS 69615, at *8-9 (W.D. Tenn. Feb. 26, 2020) (excluding expert economist's wage loss calculations that applied a yearly 0.8% increase in annual earnings, in part, because his calculations relied upon general statistics about average Americans and failed to take into account individual characteristics of the plaintiff).

23. The Court concludes that the opinions offered by Mr. Shael Wolfson are not properly supported and are accordingly given no weight. *Rhodes v. Genesis Marine, LLC of Delaware*, Civil Action No. 2:18-746 (E.D. La. July 11, 2019) (holding that economic loss expert would not be permitted to testify that the plaintiff's annual wage would increase by .8% annually).

24. For the reasons noted herein, the Court rejects Wolfson's calculation of Plaintiff's future wage loss.

25. Dr. Boudreaux submitted an expert report in accordance with *Culver II*. As such, the Court credits Dr. Boudreaux calculations.

26. Based upon the evidence and testimony presented at trial, the Court finds that Plaintiff can return to work post-trial consistent with his FCE earning $38,409.92 per annum. The Court further assumes that Plaintiff's wages will increase to $48,086.72 after three years. Based on these assumptions and discounting for present value, the Court finds that Plaintiff is entitled to $_____ in future wage loss.

27.     The Court concludes that, as a matter of law, Vaughn's past and future wage loss totals $_____ and that Vaughn is entitled to such damages.

## C.     Fringe Benefits

28.     Generally speaking, a Jones Act seaman is also entitled to any loss of fringe benefits caused by his accident. *See, e.g., McGee v. Rowan Cos., Inc.*, No. 08-4715, 2009 U.S. Dist. LEXIS 88077, 2009 WL 3150309, at *3 (E.D. La. Sept. 24, 2009) (awarding fringe benefits to a Jones Act seaman); *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 490 (5th Cir. 1985) (affirming the district court's award for loss of fringe benefits to a Jones Act seaman).

29.     That said, the Court agrees with Boudreaux that, if Vaughn is capable of returning to full time, steady employment in almost any capacity, "the most economically important fringe benefits are unlikely to be lost." Because this Court finds that Vaughn could return to work full time at any of the jobs testified to by Ms. Favaloro and Mr. Aaron Wolfson, the Court rejects Mr. Shael Wolfon's calculations as to past and future fringe benefits. *Badeaux v. Eymard Bros. Towing Co*., No. 19-13427, 2021 U.S. Dist. LEXIS 227738, at *59 (E.D. La. Nov. 29, 2021) (Vance, J.).

30.     Based upon the assumption that Vaughn's return to work will be accompanied by health and dental insurance, the Court finds that Plaintiff is not entitled to any damages for loss of fringe benefits.

## D.     "Lost Meals"

31.     Vaughn also seeks damages for past and future "lost meals." Plaintiff's economic loss expert, Mr. Shael Wolfson using an "estimated" employer meal cost has opined that Vaughn has sustained $19,684 in past "lost meals" and between $114,810 and $134,517 in future "lost meals."

32.     With respect to past lost meals, the Court rejects Mr. Shael Wolfson's calculations and finds that Plaintiff is not entitled to any damages for past lost meals.

33.     "Found" is "an element of damages, which represents the value of living expenses provided to a seaman by his employer as a condition of employment while aboard ship. It usually includes expenses for food, lodging, and clothing." Oatis v. Diamond Offshore Mgmt. Co., No. 09-3267, 2010 WL 1292403, at *3 n.1 (E.D. La. Mar. 22, 2010); see also Steed v. Stokes Towing Co., Inc., 96-1008, p. 5 (La. App. 5 Cir. 6/30/97); 709 So. 2d 790, 793 (citations omitted).

34.     As recognized by the Fifth Circuit, "a recovery of 'found' should preclude recovery of maintenance for the same period of time . . . and vice versa." *Deslatte v. Tidex, Inc*., No. 94-40810, 1996 U.S. App. LEXIS 44865, at *14, n.4 (5th Cir. 1996) (citing *Alexandervich*

*v. Gallagher Bros. Sand & Gravel Corp.*, 298 F.2d 918, 920 (2d Cir. 1961); *Richardson v. St. Charles-St. John the Baptist Bridge and Ferry Auth.*, 284 F. Supp. 709, 713 (E.D. La. 1968)). This is because "[f]ound refers to damages awarded as recovery for offshore living expenses, including lost offshore meals." *Deslatte*, 1996 U.S. App. LEXIS 44865, at *14, n.1. Indeed, courts should not "award[] both maintenance and found for the same time period," because the two are synonymous. *Id.* at 418; *see also Abuan v. Smedvig Tankships, Ltd.*, 96-1013 (La. App. 4 Cir. 6/24/98), 717 So. 2d 1194, 1206 (reversing award of found because defendant's obligation to pay found has "been satisfied by its payment of maintenance" and award of found, therefore, constituted an impermissible double recovery) (citation omitted).

35.    Because ACBL paid maintenance to Plaintiff from January 19, 2018 through trial, Plaintiff is not entitled to recover for past lost meals.

36.    With respect to future lost meals, the Court rejects Mr. Shael Wolfson's calculations and also finds that Plaintiff is not entitled to any damages for future lost meals.

37.    The cost of food per crew member per day for ACBL was $6.26. In his calculations, Mr. Shael Wolfson utilized an "estimated" employer meal cost instead of the actual cost of food incurred by ACBL per crew member per day. Accordingly, the factual predicate underlying Wolfson's calculations is incorrect and unreliable.

38.    In addition, Wolfson's calculations assume Vaughn would remain employed in the maritime industry indefinitely through his remaining work-life expectancy. There was no evidence at trial supporting any such assumption.

39.    An expert is required to provide a factual predicate for the opinions offered, absent which, the opinion does not satisfy Rule 702. *See Brimer v. Chase Bank*, No. 7:10-cv-7, 2011 WL 13233317, at *2 (N.D. Tex. Jan 13, 2011) ("Threadbare opinions are insufficient, and experts are required to give a factual predicate for each opinion in their report.); *Atl. Specialty Ins. Co. v. Porter, Inc.*, No. 15-570, 2016 WL 6569346, at *2 (E.D. La. Nov. 4, 2016) ("The aim is to exclude expert testimony based merely upon subjective belief or unsupported speculation."). Wolfson's speculative calculations based solely upon "estimates" have no factual predicate and are unreliable. *See, e.g., Cabahug v. Text Shipping Co., Ltd.*, 98-0786 (La. App. 1 Cir. 5/12/00), 760 So. 2d 1243, 1255–56 (excluding expert's opinion that $18.00 per day should be awarded as "found" because opinion was not based in fact and was unreliable); *Scott v. Dorel Indus., Inc.*, No. 3:09-CV-0799-K (BF), 2010 WL 11463303, at *2 (N.D. Tex. Oct. 29, 2010) (finding that expert's opinions were "not supported by data or analysis" and, as a result, were "unreliable and should be excluded").

40.     An award for damages cannot stand when the evidence to support it is speculative or purely conjectural." *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 194 (5th Cir. 1991); *see also In re Air Crash Disaster at New Orleans, LA.*, 795 F.2d 1230, 1235 (5th Cir.1986); *Haley v. Pan American World Airways, Inc.*, 746 F.2d 311, 316 (5th Cir.1984).

41.     Accordingly, having found that there exists no sufficient factual predicate for the award of future lost meals, Plaintiff is not entitled to recover for speculative future lost meals.

### E.     Past Medical Expenses

42.     As to a plaintiff's past medical expenses, it is well established that a seaman "clearly can receive only one recovery for his medical expenses." *Brister v. A.W.I., Inc.*, 946 F.2d 350, 361 (5th Cir. 1991). Accordingly, a seaman cannot recover tort damages that are duplicative of his cure awards. *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 639 (E.D. La. 2007).

43.     The evidence and testimony at trial established that ACBL paid $149,813.56 in cure on behalf of Plaintiff.

44.     Furthermore, the Court has found that Plaintiff reached maximum medical improvement for all of his injuries as of June 22, 2022.

45.     Because all of Plaintiff's pre-MMI expenses have been paid for by ACBL, Plaintiff is not entitled to any damages for past medical expenses.

### F.     Future Medical Expenses

46.     Generally, in order to recover future medical expenses, a plaintiff is required to show there is a reasonable probability that the medical expenses resulting from the injury will be incurred in the future and then show the reasonable costs of such care. "The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that the future medical expenses will be medically necessary." *Boudreaux v. Ace Am. Ins. Co.*, No. 11-1213, 2013 U.S. Dist. LEXIS 42378, at *10 (E.D. La. Mar. 25, 2013).

47.     As set forth above, considering the evidence and testimony presented at trial, the Court finds that Vaughn is not entitled to any future medical expenses, as such expenses are either not reasonable and medically necessary or are too speculative to be quantified.

### G. General Damages – Pain and Suffering

48. Jones Act seamen are entitled to recover damages for their own pain and suffering in connection with a personal injury. *See In re Denet Towing Serv., Inc.*, No. 98-1523, 1999 U.S. Dist. LEXIS 8058, at *4 (E.D. La. May 21, 1999).

49. Notwithstanding the foregoing, it is well-established under the Jones Act and General Maritime Law that non-pecuniary damages, such as loss of enjoyment of life, mental anguish, and other non-economic damages, cannot be recovered. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (finding that the Jones Act limits recovery to pecuniary losses only); *Scarborough v. Clemco Industries, Inc.*, 391 F.3d 660, 665-66 (5th Cir. 2004) (holding that neither a Jones Act seaman nor his survivors could recover non-pecuniary damages against either his employer or third-party non-employer); *Wade v. Clemco Indus. Corp.*, No. 16-502, 2017 U.S. Dist. LEXIS 13580, 2017 AMC 1104 (E.D. La. 2017) (Fallon, J.) ("[T]he Fifth Circuit has now made it clear that under both the Jones Act and general maritime law, a seaman's damages against both employers and non-employers are limited to pecuniary losses."); *In re Offshore Transport Servs., LLC*, 409 F. Supp. 2d 753, 754 n. 1 (E.D. La. July 14, 2005) (granting a motion for partial summary judgment and dismissing claims for mental and physical anguish, loss of enjoyment of life, loss of consortium, emotional distress, and emotional anguish brought in a seaman's wrongful death action); *In re Adriatic Marine, LLC*, 2022 A.M.C. 158, 2022 U.S. Dist. LEXIS 76283, at *5-7 (E.D. La. Apr. 27, 2022) (Barbier, J.).

50. Considering the applicable law, this Court rejects Plaintiff's claims for loss of enjoyment of life. Nevertheless, Plaintiff is entitled to general damages for his pain and suffering.

51. The "amount awarded for pain and suffering depends to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation." *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1357 (5th Cir. 1988).

52. Here, the Court finds that Vaughn experienced considerable pain and suffering as a result of his injuries. Vaughn underwent two arthroscopic shoulder surgeries and a neck surgery. For these reasons the Court awards Plaintiff $125,000 in past pain and suffering and $150,000 in future pain and suffering. *Weeks Marine, Inc. v. Watson*, 190 F. Supp. 3d 588 (E.D. La. 2016) (awarding $350,000 for past and future pain and suffering to a seaman who suffered from left knee joint, left leg and lumbar and cervical pain requiring a left knee surgery, radiofrequency neurotomy of the L4-5 nerve, and a two-level cervical fusion in the future); *Townsend v. Diamond Offshore*, C.A. No. 07-7651, 2009 U.S. Dist. LEXIS 69215 (E.D. La. Aug. 7, 2009) (awarding $200,000 for the aggravation of a pre-existing condition culminating in a lumbar disectomy at L4-5); *Smith v. Seariver Maritime, Inc.*, C.A. No. 00-2025, 2002 U.S. Dist. LEXIS 11205 (E.D. La. June 19, 2002) (awarding

$300,000 for seaman who underwent lumbar laminectomy and lumbar fusion at L4-L5); *Lomax v. Marquette Transp.*, No. 16-17825, 2019 U.S. Dist. LEXIS 941 (E.D. La. Jan. 3, 2019) (awarding $150,000 in pain and suffering to seaman who suffered injury to face and cervical and lumbar disc protrusions requiring injections and future lumbar fusion surgery).

### H. Pre-Judgment Interest

53. In admiralty, the Court has the discretion to award pre-judgment interest. There is a strong presumption in favor of awarding pre-judgment interest, and it will usually be denied only in cases in which the plaintiff exercised undue delay in bringing his action. *United States v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001). When a Jones Act case is tried to a jury, the Court may not award pre-judgment interest, but when a Jones Act case is tried to the Court, it may award pre-judgment interest. *McPhillamy v. Brown & Root*, 810 F.2d 529, 532 (5th Cir. 1987). It is within the Court's discretion to select an equitable rate of pre-judgment interest. *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991).

54. The Court finds that Plaintiff is entitled to receive pre-judgment interest at 5%.

### IV. <u>Maintenance and Cure and Punitive Damages</u>

55. A Jones Act employer owes an obligation to provide maintenance and cure to any seaman that is injured or becomes ill while in the service of the vessel. *Pelotto v. L&N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979).

56.  Maintenance and cure must be paid by the seaman's employer, regardless of fault of the employer or unseaworthiness of the vessel, until the seaman reaches maximum medical improvement or "maximum cure." *Id*. "[M]aximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition." *Id*. If a "seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition," maximum cure has been achieved. *Id*.; *see also Alario v. Offshore Serv. Vessels, LLC*, 477 F. App'x 186, 187 (5th Cir. 2012).

57. "It logically follows that, when a particular medical procedure is merely palliative in nature or serves only to relieve pain and suffering, no duty to provide payments for cure exists." *Barto v. Shore Constr., LLC*, 801 F.3d 465, 476 (5th Cir. 2015) (internal quotations and citations omitted).  Any ambiguities or doubts as to whether a seaman is entitled to maintenance and cure are to be resolved in favor of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962). Thus, "[a] determination to terminate a seaman's right to maintenance and cure must be unequivocal." *Johnson v. Marlin Drilling Co.*, 893 F.2d 77,

79 (5th Cir. 1990) (citing *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985)).

58.     The parties do not dispute that ACBL paid maintenance and cure to Plaintiff from January 19, 2018 until the date of trial. ACBL paid Plaintiff at a rate of $30 per day in maintenance and paid $149,813.56 in curative medical expenses.

59.     Plaintiff contended that ACBL failed to pay $44,239.19 in curative medical expenses. These medical expenses were allegedly paid for by Plaintiff's attorney. The parties stipulated that ACBL contacted Plaintiff's medical providers to pay these outstanding amounts, however, the medical providers would not accept payment. ACBL contacted Plaintiff's counsel several times for proof of payment of these medical expenses so that ACBL could reimburse and/or pay these outstanding costs. The parties stipulated at trial that this issue has been resolved.

60.     Considering the evidence and testimony at trial, this Court holds that Plaintiff reached maximum medical improvement for his injuries as of June 22, 2022. As such, considering the foregoing, the Court finds that ACBL has satisfied its obligation to pay maintenance and cure and ACBL no owes no further maintenance and cure obligations.

61.     Plaintiff seeks punitive damages from ACBL for the delay in payment of $44,239.19 in cure expenses. Again, these expenses were paid or handled by Plaintiff's attorney.

62.     Under General Maritime Law, upon receiving a claim for maintenance and cure, a Jones Act employer is entitled to investigate and corroborate the claim and need not commence payments immediately.

63.     "It is well-settled that a ship-owner who arbitrarily and capriciously denies maintenance and cure to an injured seaman is liable to him for punitive damages and attorney's fees." *Breese*, 823 F.2d at 103 (internal quotations omitted). "No bright line separates the type of conduct that properly grounds an award of punitive damages—a ship-owner's willful and callous default in its duty of investigating claims and providing maintenance and cure— from the type of conduct that does not support a punitive damages award." *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 90 (5th Cir. 1984). However, examples of employer behavior that could merit punitive damages have included (1) laxness in investigating a claim; (2) termination of benefits in response to the seaman's retention of counsel or refusal of a settlement offer; and (3) failure to reinstate benefits after diagnosis of an ailment previously not determined medically. *Tullos v. Res. Drilling*, 750 F.2d 380, 388 (5th Cir. 1985). Further, the "the willful, wanton and callous conduct required to ground an award of punitive damages requires an element of bad faith." *Harper*, 741 F.2d at 90. Indeed, courts recognize that the seaman must show that the employer has violated "the dictates of

humanity." *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 414 (2009) (citing *The Troop*, 118 F. 769, 770-771, 773 (D. Wash. 1902)).

64.     Considering the evidence and testimony at trial, and the stipulations of the parties, this Court finds that Plaintiff is not entitled to any award of punitive damages against ACBL. ACBL dutifully paid maintenance and cure to Plaintiff for over 4 years. ACBL did not act in bad faith and there is no evidence that it behaved in an arbitrary or capricious manner.


Respectfully submitted,

*/s/ R. Scott Jenkins*
R. SCOTT JENKINS (La. Bar No. 23144)
SARA B. KUEBEL (La. Bar No. 38305)
ABIGAIL J. WEILAND (La. Bar No. 40543)
JONES WALKER, LLP
201 St. Charles Avenue – 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:     (504) 582-8346
Facsimile:     (504) 589-8346
Email:          sjenkins@joneswalker.com
                skuebel@joneswalker.com
                aweiland@joneswalker.com

**Attorneys for Defendant, American Commercial Barge Line, LLC**