UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMAL VAUGHN                                         CIVIL ACTION

VERSUS                                              NO. 18-7735

AMERICAN COMMERCIAL                                 SECTION: "J"(2)
BARGE LINE, LLC

## ORDER AND REASONS

This matter is before the Court on remand from the United States Court of Appeals for the Fifth Circuit. On appeal, the Fifth Circuit affirmed this Court's judgment with respect to all issues except for the Court's determination of Plaintiff's future wage loss. Accordingly, on remand, the Court need only resolve this issue, in addition to settling the parties' dispute concerning when interest on the judgment for future lost wages begins to accrue.

## FACTS AND PROCEDURAL BACKGROUND

The Court recited the facts of this case in its Findings of Fact and Conclusions of Law on June 22, 2023 (Rec. Doc. 67), and therefore, will only recount them briefly here. Defendant, American Commercial Barge Line, LLC ("ACBL"), hired Plaintiff, Jamal Vaughn, as a Probationary Deckhand in February of 2016. Shortly thereafter in May of 2016, Vaughn received a promotion to Deckhand, at which time ACBL also increased Mr. Vaughn's daily wage rate from $172.00 to $219.80. On January 19, 2018, Mr. Vaughn was working aboard the M/V SAFETY EXPLORER for ACBL when the vessel allided with another vessel on the Mississippi River. The force from the

1

allision caused Mr. Vaughn to be violently thrown around the galley, resulting in injuries to his head, neck, back, and shoulder. Several physicians treated Mr. Vaughn for these injuries in the aftermath of the allision, and one of these doctors, Dr. Todd, did not believe that Mr. Vaughn could return to work as a deckhand and consequently ordered vocational rehabilitation. At trial, both parties presented reports from vocational rehabilitation experts, and these reports confirmed that Mr. Vaughn could no longer perform the physical labor required of a deckhand. Instead, these experts indicated that after the injury, Mr. Vaughn should limit himself to light to medium physical labor, which also entailed a substantial diminution in Mr. Vaughn's future earning capacity.

Mr. Vaughn brought the instant suit against ACBL on August 15, 2018, to recover damages for past and future medical expenses, past and future lost wages, past pain and suffering, and future pain, suffering, and disability. A bench trial was held in June of 2023, and the Court rendered a judgment in favor of Mr. Vaughn, assessing his total damages at $1,879,298.00. ACBL appealed the Court's judgment concerning Vaughn's past and future wage losses, and Vaughn appealed the Court's denial of punitive damages and attorney's fees. The Fifth Circuit affirmed the Court's judgment except for the damage award for future wage loss, which it vacated and remanded for reconsideration. The primary instruction the appellate court gave was that in recalculating Mr. Vaughn's future lost wages, the Court should apply the steps outlined in *Culver v. Slater Boat Co.* (*Culver II*) and explain its reasoning, with specific focus on the "evidence that supports the findings at each step." *Vaughn v.*

2

*Am. Com. Barge Line, L.L.C.*, No. 23-30494, 2025 WL 2945812, at *4 (5th Cir. Oct. 17, 2025).

## LEGAL STANDARD

When a plaintiff suffers an injury that negatively affects his earning capacity, he is entitled to recover for this future loss of earnings. Calculating a plaintiff's future lost earnings "involves four steps: estimating the loss of work life resulting from the injury . . ., calculating the lost income stream, computing the total damage, and discounting that amount to its present value." *Culver v. Slater Boat Co.* (*Culver II*), 722 F.2d 114, 117 (5th Cir. 1983). In *Culver II*, the Fifth Circuit explained that the "paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned." *Id.* at 120. To achieve this goal, the factfinder, usually based on expert testimony and reports, must account for inflation. Stated another way, the factfinder must discount the award for future lost wages to its present value, which constitutes the fourth step in the calculation.

After estimating the number of remaining years in the plaintiff's work life, the factfinder must determine what the injured plaintiff would have earned had he not suffered an injury. To do so, the factfinder should start with the injured plaintiff's "gross earnings . . . at the time of injury" *Id.* at 117. Next, the factfinder must adjust these gross earnings by adding any fringe benefits to the amount and deducting any required payments, such as income tax. *Id.* Once the adjusted gross income that the plaintiff would have earned but-for the injury is established, the factfinder should

multiply it by the number of remaining years in the plaintiff's work life. The result represents the lost income stream. When the plaintiff will be able to return to work in some capacity, the wages he is expected to earn for the remaining years of his work life must be subtracted from the lost income stream. The fourth and final step in the process involves accounting for inflation, or discounting the future amount to its present value.

While there are several ways to discount the future damages amount to its present value, the Fifth Circuit held in *Culver II* that absent a stipulation by the parties, the factfinder must use the "below-market discount rate method." *Id.* at 122. Under this method, "the fact-finder does not attempt to predict the wage increases the particular plaintiff would have received as a result of price inflation," but instead "estimates the wage increases the plaintiff would have received each year as a result of *all factors other than inflation.*" *Id.* at 118 (emphasis added). Such factors include the injured plaintiff's "personal merit, increased experience and other individual and societal factors." *Id.* at 122. Only when the injured plaintiff presents evidence, beyond mere speculation, that he would have received yearly wage increases, should these increases be included when calculating the lost income stream. *See id.* at 120–21. Once the total damages are determined, the factfinder must discount the amount by a below-market discount rate, which "represents the estimated market interest rate, adjusted for the effect of any income tax, and then offset by the estimated rate of general future price inflation." *Id.* at 118. Perhaps most importantly, a plaintiff should not be allowed to "'double-dip' on his future wage loss claim," *Sanders v. Weeks*

4

*Marine, Inc.*, No. 23-7317, 2024 WL 4346515, at *7 (E.D. La. Sep. 30, 2024) (Ashe, J.), which occurs when the factfinder first predicts the plaintiff's yearly wage increases based on inflation and then also uses the below-market discount rate, thereby enabling the projected effects of inflation to benefit the plaintiff twice.

**DISCUSSION**

In the Findings of Fact and Conclusions of Law after the bench trial (Rec. Doc. 67), the Court based its award for future wage loss on an extrapolation of the numbers calculated by both Plaintiff's and Defendant's economic experts. On appeal, the Fifth Circuit concluded that the Court did not explain its reasoning "with sufficient particularity to allow [the appellate court] to determine rather than speculate that the law has been correctly applied." *Vaughn*, 2025 WL 2945812, at *3 (citation omitted). Furthermore, Defendant objected to Plaintiff's expert's estimated future wage loss because, according to Defendant, Mr. Vaughn's expert allowed "Plaintiff to 'double-dip' because he utilize[d] both the below-market-discount method and also increase[d] the base wage rate for inflation." (Rec. Doc. 37-1, at 1). More specifically, Shael Wolfson, Ph.D., presumably looked at the large yearly increases that Plaintiff had received between 2015 and 2017 and estimated that his annual salary would continue to increase at 3.7% per year, citing the Employment Cost Index for this particular percentage. Defendant contends that the Employment Cost Index itself measures the inflation of labor costs. Moreover, Defendant argues that Plaintiff did not present evidence to suggest that his wages would continue to increase, as they

5

had between 2015 and 2017, for any reason other than inflation. Therefore, Defendant argued that Wolfson's report did not comply with *Culver II*.

Based on the wage increases Mr. Vaughn received between 2016 and the time of the accident in early 2018, the Court firmly believes that his yearly wages with ACBL would have continued to increase had he not suffered an injury. However, Plaintiff did not present any evidence or proof that his annual salary would continue to increase for any reasons other than inflation. Therefore, the Court will assume that Mr. Vaughn's salary at ACBL would have remained the same through the end of his work life. Accordingly, the discussion and calculations below address the concerns not only of the Fifth Circuit, but also of Defendant.

The first step under *Culver II* is to estimate the loss of work life resulting from the plaintiff's injury. Mr. Vaughn's economic expert, Wolfson, estimated Plaintiff's remaining work life at 33.04 years, while Kenneth Boudreaux, Ph.D., Defendant's economic expert, provided an estimate of 26.08 years. These numbers are close to each other, but because Plaintiff was only 27 at the time of trial (or the "reference date" used in the experts' reports), the Court concludes that it is much more realistic and likely that Plaintiff will work for 33 more years until he is 60, as Plaintiff's expert estimated, as opposed to leaving the workforce in his early 50s as Defendant's expert projected. Accordingly, the Court finds that Plaintiff had a remaining work life of 33.04 years when this matter was tried in 2023.

Next, the Court must calculate the lost income stream, which "begins with the gross earnings of the injured party at the time of injury." *Culver II*, 722 F.2d at 117.

Then, the factfinder should add "other income incidental to work, such as fringe benefits," to the base number before subtracting expenses like income tax.[1] *Id.* At the time of his injury, Plaintiff earned a gross annual salary of $56,328.85, the number which both economic experts used in their reports.

The Court next looks to the parties' vocational rehabilitation experts' reports to determine the type of employment and salary Mr. Vaughn can expect to receive in the future, based on his decreased physical capability since the injury, in addition to "his age, education, past work history, transferable skills, vocational test results, and physical capabilities as outlined in the records." (Rec. Doc. 66-35, at 16). Plaintiff's vocational expert, Aaron Wolfson, Ph.D., presented five alternate occupations, along with their physical strength demands and information about annual wages, for which Mr. Vaughn might qualify. Across all five occupations, the starting salaries ranged from $17,530.00 to $29,530.00. Plaintiff's vocational expert explained that "Mr. Vaughn would likely earn closer to the starting wage ranges in alternate occupations, and with time and experience, he can increase his earnings." *Id.*

Similarly, Defendant's expert, Nancy Favaloro, presented six alternate jobs that would be compatible with Mr. Vaughn's "vocational profile . . . and the work restrictions as set forth in the Functional Capacity Evaluation dated December 8, 2021." (Rec. Doc. 66-38, at 8). For the most part, both experts arrived at similar salary

---

[1] In recalculating the award for future lost wages, the Court decided to base its calculations primarily on Boudreaux's report, so the Court has not undertaken the step of adding fringe benefits or deducting expenses from Mr. Vaughn's gross salary because Boudreaux presumably already accounted for these factors.

ranges that Mr. Vaughn might earn in the future. Boudreaux, Defendant's economic expert, calculated Vaughn's future lost income based on three different salaries: $28,733.12 per annum, $37,686.67, and $48,086.72 per annum, all based on averages drawn from Favaloro's April 26, 2023 report. The Court decided to use $28,733.12 as Mr. Vaughn's estimated future salary, in part because this number is more in line with the estimates presented by Plaintiff's expert, but also because the Court finds this number more reasonable based on Mr. Vaughn's post-injury capacity for physical labor, in addition to his age, education, and work experience. The Court has included an explanation of its calculations below.

Under *Culver II*, the fourth step involves applying a below-market discount rate to the estimated amount of damages to account for inflation, or to reduce the amount to its present value. At the time of trial, Plaintiff's expert used a 1.1% discount rate, while Boudreaux used a range between 0.00% and 2.60%. Furthermore, Boudreaux explained that he derived this range "from the returns currently [in 2023] available in risk-free investments (U.S. Treasury 'Inflation Indexed Bonds') that can readily duplicate the lost amounts across time," (Rec. Doc. 66-41, at 5), which is what *Culver II* recommends. Therefore, the Court will take the midpoint of Boudreaux's range—1.3% (which is also close to Wolfson's discount rate)—as the appropriate discount rate to account for inflation.

Boudreaux estimated that if Mr. Vaughn were to earn a net salary of $28,733.12 per annum for 26.08 years, he would suffer a diminution of future earnings in the amount of $450,836.82. This midpoint number that Boudreaux

provided represents a model whereby Mr. Vaughn's future salary would neither increase nor decrease each year, and of course, the total represents the present value of the future damages based on a 1.3% below-market discount rate. The only difference between Boudreaux's calculation and the Court's finding concerns the remaining years in Mr. Vaughn's work life. Boudreaux estimated that Mr. Vaughn would work for only 26.08 more years, whereas the Court finds Wolfson's estimate of 33.04 years more reasonable. When the Court takes Boudreaux's calculation as the starting point and adds seven more years' worth of estimated lost income, discounted to present value, the total comes to roughly $600,000. Accordingly, the Court will reduce its prior award of $750,000 in lost future earnings to $600,000.

Next, Defendant contends that under Fifth Circuit precedent, "when a case is remanded for recalculation or reconsideration of damages and the appellate mandate is silent on interest, interest on any award accrues from the date of the second judgment—not the original judgment." (Rec. Doc. 91, at 1). Conversely, Plaintiff argues that if post-judgment interest began to accrue only after the second judgment, that would be tantamount to allowing Defendant to "receive the benefit of using plaintiff's money for two years after the district court concluded that defendant was liable to him." (Rec. Doc. 90, at 1). Because the Fifth Circuit affirmed the Court's judgment in all respects except for the amount of future lost wages, the only issue to be resolved is when the interest on the future lost wages begins to accrue. The interest on the remainder of the judgment began to accrue on the date of the initial judgment.

In this case, federal law governs "the award of postjudgment interest, including decisions about when postjudgment interest begins to accrue." *ExxonMobil Corp. v. Elec. Reliability Servs., Inc.*, 868 F.3d 408, 419 (5th Cir. 2017). The relevant statute, 28 U.S.C. § 1961(a) provides that "[s]uch interest shall be calculated from the date of the entry of the judgment." 28 U.S.C. § 1961(a). This rule is less straightforward when there are multiple judgments in a single case, as happens when a party appeals a district court's decision and the appellate court remands for further proceedings. Federal Rules of Appellate Procedure Rule 37 outlines when interest should begin to accrue in a case that has been appealed under two circumstances: when the appellate court affirms the lower court's judgment and when the appellate court reverses, Fed. R. App. P. 37, but what constitutes a reversal or modification is not always clear.

In addressing this issue, the Fifth Circuit has stated that when "the original judgment is substantially affirmed by this court on appeal, . . . [federal post-judgment] interest properly accrues from the date of the initial judgment because that is the date on which the correct judgment should have been entered." *ExxonMobil Corp.*, 868 F.3d at 419–20 (internal quotation marks omitted) (quoting *Brooks v. United States*, 757 F.2d 734, 740, 741 (5th Cir. 1985)). Defendant cites to *Vickers v. Chiles Drilling Co.* and *Masinter v. Tenneco Oil Co.*, 929 F.2d 191 (5th Cir. 1991) (what Defendant refers to as *Masinter I* but is actually *Masinter II*), to support what it calls the Fifth Circuit's "clear rule" that post-judgment interest begins to accrue from the date of the second judgment when an appellate court remands the

case but remains silent on the issue of interest. Both of these cases are distinguishable from the instant matter, however.

First, the Fifth Circuit heard two appeals in *Vickers*, one of them after the case had been remanded to the district court. *Vickers v. Chiles Drilling Co.* (*Vickers I*), 822 F.2d 535 (5th Cir. 1987); *Vickers v. Chiles Drilling Co.* (*Vickers II*), 882 F.2d 158 (5th Cir. 1989). In the second appeal, the court held that when "an appellate court reverses or modifies a judgment with a direction that a judgment be entered against a party, the mandate from the appellate court must specifically order that interest run from the date of the first judgment, else interest runs from the date of the second, modified judgment." *Vickers II*, 882 F.2d at 159 (citing Fed. R. App. P. 37). The court's language, derived from Federal Rule of Appellate Procedure 37, makes it clear that this rule about interest applies only when an appellate court does one of two things: (1) reverses a judgment, or (2) modifies a judgment while also directing that a judgment be entered against a party. In other words, the rule that post-judgment interest runs from the date of the second judgment unless the appellate court specifies otherwise applies when the appellate court reverses or modifies the district court's judgment *substantively*.

On first appeal, the *Vickers* court did just that; it reversed the lower court's ruling concerning whether a design defect existed and remanded the case with the mandate that the district court redetermine causation based on the rules of comparative fault in admiralty cases. *Vickers I*, 822 F.2d at 540–41. The appeals court also directed the trial court to award any damages for mental anguish which Vickers's

11

injury had proximately caused. *Id.* at 541. These appellate rulings were substantive and went to the merits of the case. In the instant case, on the other hand, the Fifth Circuit substantially affirmed the Court's earlier judgment and remanded for a recalculation of future lost wages only. Unlike the court in *Vickers*, the Fifth Circuit here did not reverse any of the Court's findings, nor did it direct the Court to award damages that it had not previously awarded.

Defendant's reliance on *Masinter II* is similarly misplaced, as is Plaintiff's reliance on *Masinter III*. The Fifth Circuit heard appeals in *Masinter v. Tenneco Oil Co.* on four separate occasions. In *Masinter II*, the Fifth Circuit held that "without an order that interest on the future lost wages runs from the date of the first judgment, it should have run from the date of the second judgment." *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 195 (5th Cir. 1991) (citation omitted). In a subsequent rehearing, the Fifth Circuit reversed the earlier decision and mandated that the district court should "award interest on the award of future lost wages from the date of the first judgment." *Masinter v. Tenneco Oil Co.*, 934 F.2d 67, 68 (5th Cir. 1991). Subsequently, however, the court reinstated its prior opinion and remanded the issue of post-judgment interest on Masinter's future lost wages for the district court's consideration. *Masinter v. Marlin Drilling Co., Inc.*, 938 F.2d 536 (5th Cir. 1991).

On remand, the district court held that the post-judgment interest on the future lost wage award began to accrue on the date of the first judgment, which undermines Defendant's argument. *Masinter v. Tenneco Oil Co.*, No. 85-1919, 1991 WL 197154, at *1 (E.D. La. Sep. 11, 1991). Also importantly, *Masinter*'s procedural

posture differed significantly from the instant case. The Fifth Circuit had initially given Masinter the choice of remittitur or a new trial, and Masinter chose a new trial. In the Fifth Circuit opinion cited by Plaintiff, the court said, "Had Masinter chosen to accept the remittitur, he would have received interest from the date of the judgment in the first trial." *Masinter*, 934 F.2d at 68. In other words, the fact that Masinter chose a new trial determined when post-judgment interest on the award for future lost wages began to accrue. The court explained that a remittitur, which is similar to remanding a case for the district court to recalculate only part of an award (as here), would not affect when post-judgment interest began to accrue.

In a more recent case, *ExxonMobil Corp. v. Electrical Reliability Services, Inc.*, Exxon argued that the Fifth Circuit had "applied post-judgment interest from the date of the original judgment only in cases in which remand was for recalculation of damages or other, minor changes, whereas the instant case required the district court to conduct a substantive analysis of its prior findings in light of intervening law." 868 F.3d 408, 420 (5th Cir. 2017). In responding to this argument, the Fifth Circuit clarified that to determine whether post-judgment interest should accrue from the date of the initial judgment or the date of the judgment on remand, "the primary consideration is the degree to which the original judgment is ultimately upheld or invalidated, not the characterization of the district court's labors on remand." *Id.* The Court held that interest in that case began to accrue from the date of the initial judgment and strongly suggested that generally, unless the appellate court found the

"judgment lacking in evidentiary or legal support," post-judgment interest on awards for future lost wages should begin to accrue on the date of the first judgment. *Id.*

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the Court's prior award to Plaintiff of $750,000 in future lost wages shall be reduced to $600,000.

**IT IS FURTHER ORDERED** that post-judgment interest on the amended award of $600,000 began to accrue on the date of the first judgment, which was June 22, 2023.

New Orleans, Louisiana, this 17th day of March, 2026.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE